1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6                                   EUREKA DIVISION

7

8    DOUGLAS E.,[1]                              Case No.  24-cv-04461-RMI

9                    Plaintiff,
                                                **ORDER RESOLVING SOCIAL**
10           v.                                  **SECURITY APPEAL**

11    MARTIN J. O'MALLEY, et al.,                Re: Dkt. Nos. 9, 15

12                    Defendants.

13           Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision finding that

14   Plaintiff was not disabled under Title II of the Social Security Act.  *See* Admin. Rec. at 1.[2]  The

15   Appeals Council of the Social Security Administration declined to review the ALJ's decision.  *Id.*

16   As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security,

17   appropriately reviewable by this court.  *See* 42 U.S.C. § 405(g), 1383(c)(3).  Both parties have

18   consented to the jurisdiction of a magistrate judge (Dkts. 4, 6), and both parties have filed briefs

19   (Dkts. 9, 15).  For the reasons stated below, Defendant's motion for summary judgment is

20   DENIED, and the case is REMANDED to the ALJ for further proceedings consistent with this

21   order.

22      **I.      Factual Background**

23           For purposes of this opinion, the court is concerned primarily with Plaintiff's history of

24   mental illness.  As the record in this matter is over 6,000 pages long, the court will begin with a

25   _____

26   [1] Pursuant to the recommendation of the Committee on Court Administration and Case
     Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

27   [2] The Administrative Record ("AR"), which is independently paginated, has been filed in 17
28   attachments to Docket Entry #8.  *See* dkts. 8-1 through 8-17.

*United States District Court*
*Northern District of California*

cursory timeline of Plaintiff's symptoms and provide more detail as necessary during its analysis.

Plaintiff had a self-described "rough past" that included homelessness, incarceration, and several assaults on law enforcement officers.  AR at 451, 2560.  By 2004, Plaintiff had married and started a business.  *Id.* at 3394.  Around that time, however, he began abusing methamphetamine, which cost him his business and home.  *Id.*  His wife also left him for several years during this period.  Plaintiff became depressed; although his life later stabilized, Plaintiff would continue to suffer from depression in later years.  *Id.* Plaintiff was also diagnosed with ADHD and was prescribed Adderall for it.  *Id.* at 3416.

 From 2015 to early 2020, Plaintiff worked as a car salesman.  AR at 488.  Social Security records indicate that he earned over $94,000 from this work in 2019.  *Id.* at 422.  In early 2020, the coronavirus (COVID-19) pandemic began to spread in the United States.  The pandemic was of particular concern to Plaintiff, who frequently suffered from lung ailments and had previously been diagnosed with early-stage COPD.  *Id.* at 896, 3443.  In March 2020, Plaintiff was sent home from work with a cough and sneezing.  *Id.* at 1663.  A doctor directed Plaintiff to isolate for 72 hours.  *Id.* at 1662.  Even after his symptoms abated, Plaintiff continued to request extensions of his work-excuse note from multiple care providers, citing his fear of what might happen to him if he caught the virus.  *Id.* at 1669, 1672, 1677.  Following an April 2020 appointment, Plaintiff's psychiatrist, Dr. Shin, placed Plaintiff on temporary disability for two months, citing Plaintiff's "high anxiety" about returning to work.  *Id.* at 894, 3452.  Plaintiff was simultaneously prescribed Gabapentin for his anxiety.  *Id.* at 3460.

In June of 2020, Plaintiff reported "occasional panic attacks if he needs to go outside" and that "he does not feel comfortable talking to people who wear masks."  AR at 880.  In July of 2020, Plaintiff reported that his anxiety over COVID-19 was bad enough to make him physically ill.  *Id.* at 1743, 3465.  In August of 2020, Dr. Shin noted that Plaintiff "does not go out at all" and had "severe anxiety and fear, due to the COVID-19 situation[.]"  *Id.* at 865, 868.  In September 2020, Plaintiff reported "difficulty leaving the house due to significant anxiety" and a provider noted he was "very fearful about getting COVID."  *Id.* at 853.  The same provider also noted that Plaintiff had an adverse reaction to wearing a mask, which Plaintiff attributed to his lung

United States District Court
Northern District of California

problems.  *Id.*  At appointments throughout this time period, Plaintiff was observed to be anxious.  *Id.* at 854, 867, 882.  Plaintiff's work note was extended at two-month intervals until the end of the year.  *Id.* at 4835.

In December of 2020, Dr. Shin was on leave, so Plaintiff was seen by a new provider to renew his temporary disability.  AR at 846.  The new provider determined that although Plaintiff was "clearly very fearful of dying from COVID-19[,]" it was not appropriate to extend Plaintiff's temporary disability indefinitely on the basis of anxiety alone.  *Id.* at 4835.  The temporary disability was renewed for another month.  *Id.*  At a visit the next month with the same provider, Plaintiff reported "that his pulmonary limitations result in dyspnea[3] when masking and that this drives his need for disability extensions[.]"  *Id.* at 838.  Noting that Plaintiff's medication had not improved his anxiety, the provider deemed Plaintiff "psychiatrically stable" and directed him to follow up with a pulmonologist for his respiratory problems.  *Id.*

Evidently dissatisfied with this result, Plaintiff insistently contacted four other care providers over a two-week period, stressing that he was unable to breathe with a mask on, which in turn caused anxiety attacks.  AR at 827, 1930–32, 1934, 1945–47, 1955, 3514, 3516, 3520, 3544–45.  Eventually, Plaintiff's primary care physician agreed to extend Plaintiff's disability through the end of February.  *Id.* at 1945.  When this extension expired, Plaintiff continued to insistently contact his primary care physician to seek an extension, then a note excusing him from wearing a mask, then an antibody test "to find out if I'm safe to come out of the house[.]"  *Id.* at 1994–96.  Plaintiff was seen by a pulmonologist in late March of 2021.  *Id.* at 815.  The pulmonologist agreed to extend Plaintiff's temporary disability until Plaintiff was finished with pulmonology testing, but Plaintiff repeatedly contacted the pulmonologist to demand the disability be backdated to the beginning of the month despite being told several times that this was impossible.  *Id.*, *id.* at 807–08, 810, 2048, 2062, 2084, 5024.

At an in-person evaluation, Plaintiff was observed to have shortness of breath while

---

[3] "Dyspnea, or shortness of breath, is the feeling that you can't get enough air into your lungs."  *Dyspnea*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/symptoms/16942-dyspnea (Nov. 11, 2022).

United States District Court
Northern District of California

wearing a mask despite "[g]ood patient effort and cooperation[]" during testing.  AR at 2239–40.
However, further evaluation showed that Plaintiff had "no pulmonary limitation and disability cannot be justified from the pulmonary perspective." *Id.* at 791.  Plaintiff complained to his doctors about this result, often in agitated language. *Id.* at 2297, 2301–03, 2308–09.

In the meantime, Plaintiff formed a corporation and began selling products on Amazon so that he could earn a living from home.  AR at 1967.  However, by August of 2021, Plaintiff's Amazon account had been suspended for a trademark violation. *Id.* at 764.  Around the same time, treatment notes from Plaintiff's providers began to reflect bizarre speech and behavior:

- In August of 2021, Plaintiff sought out mental health care to cope with his increasing anxiety and reduce his marijuana use.  (AR at 763).  Plaintiff described himself as "a ball of anxiety and he will look at pornography and masturbate but he is still anxious after so he keeps smoking." *Id.*  Plaintiff's counselor noted that Plaintiff was "tangential during conversation, jumps from topic to topic.  Also very religiously focused, stated that he feels that he has a calling from god and he would like to go into congress to pray with everyone and appeared somewhat grandiose. Patient also made some inappropriate remarks commenting on my looks, requesting a hug, etc." *Id.* at 764.

- In September of 2021, an addiction medicine counselor described Plaintiff as fidgety, rambling, and anxious, with a tangential thought process, impaired concentration, and paranoid ideation.  (AR at 743).  Plaintiff also reported recent passive suicidal ideation. *Id.* at 744.  Plaintiff was nervous about stopping marijuana use entirely due to "concern about whether [h]e would be able to tolerate his general level of anxiety and worry about a variety of sociopolitical topics including the . . . impact of the current pandemic." *Id.* at 745.  This counselor diagnosed Plaintiff with severe cannabis use disorder as well as anxiety and ADHD. *Id.* at 137.

- On the same day as this addiction medicine appointment, Plaintiff had an abscess on his posterior drained.  (AR at 747).  The doctor's medical assistant noted the following interaction:

     Patient was inappropriate. I called him in to the exam asking patient

> to follow me here and his comments were "oh your [sic] taking me to the back" I advised him this is a professional appointment and there will be no unappropreate [sic] discussion with me. We went to the exam room where he asked if Id like to see his abscess? I replied no, we will wait for Dr. Sanmateo. He then asked If he could ask me a question not related to the visit. I told him NO, I' advised him he could ask Dr. Sanmateo the questions he might have, he continued to tell me he wanted to ask me since I was a female. I told him No you may not . . . . After the treatment was completed[,] the physician had to advise patient to wait until we left the room to get up and get dress[ed] as he was trying to get up. Patient then made the remark ["]Oh yes I don't want to get her all excited.["] Patient was so offensive.

*Id.* at 746–47. The doctor later told Plaintiff his behavior was unacceptable and received an apology. *Id.* at 747.

- Plaintiff began a subsequent appointment by saying "I usually have an inappropriate joke right about now but last time that happened, I was reprimanded." (AR at 736).

- In October of 2021, Plaintiff had another addiction medicine appointment. (AR at 734). Besides marijuana use, Plaintiff reported "sexual addictive behaviors including pornography, going to massage parlors, and a recent incident of infidelity" which Plaintiff's wife had found out about. *Id.* Plaintiff described these exploits in sufficiently graphic detail that the addiction medicine counselor had to ask him to be less specific. The counselor also noted there was "some paranoia about global financial system expressed. Through spiritual beliefs has belief that God speaks to him at times and makes suggestions for his life. Patient perseverated some on the topic of Christian belief of second coming of Christ." *Id.*

- Later that month, Plaintiff sent the following note to Dr. Shin: "I managed to lose 75 or $80,000 in business I feel really agitated angry and a lot of it is just because I'm having a hard time talking to people being heard I have a history Of violence and I feel like I'm agitated to the point where I could blow I filed for disability with Social Security I meet with them on the 21st can you give me a note saying that I'm a reject" (AR at 3563).

- Shortly afterward, Plaintiff sent the following message to a different doctor: "I suppose I need to communicate with you issues that I'm having The worlds economy in system has given me a gut punch in such a way that was not right unfair and I feel a little volatile I

have three assault on a police officers in my past years of homelessness Incarceration and now I'm having a mental health break down I need some help If not disability an advocate to help" (AR at 2560).

- Roughly a week later, Plaintiff e-mailed that doctor again:

> Hi doc I'd like to talk to you about putting me on disability I just lost my life savings and am in debt either because I'm just too stupid I can't figure out the digital era I feel super angry about the way B of A,Trans Union and Amazon have treated me and if the cards are stacked against me like they have been I feel like the system just grab me by the throat waited till I was out of breath and then let me go I have gone through a lot of emotions from thinking I might be better off dead and to the other extreme just this side of being postal . . . my cognitive stuff I think has gotten in the way with the [sic] conducting business in a way that I can be profitable

(AR at 2578).

- Later in October 2021, Dr. Shin noted the following: "His Amazon account was eventually deactivated, he is stuck with broken stuff, not able to sell. He is upset about the situation. He is thinking about running for a public office, so that the system can be changed. He talks about spiritual aspect, talking about his disappointment about the market, system in society." (AR at 725).

- Mental health evaluations given to Plaintiff shortly afterwards indicated that Plaintiff had "[s]evere" depression and anxiety. (AR at 2589). At the same time, Plaintiff reported that he "[s]ometimes" thought of harming others, and his suicide risk was assessed as severe enough to require a safety plan. *Id.*

- Plaintiff applied for vocational assistance with the California Department of Rehabilitation. (AR at 450). Asked to describe his disabilities, he mentioned cognitive issues, a scattered mind, and difficulty finishing what he started. *Id.* at 451. But he also wrote: "Moral Disability I'm Christian and It is Againt [sic] God to have uneven scales so I can't keep my mouth shut If finance is holding a Point of Interest for telling someone thats [sic] the Lowest I can go[.]" *Id.* Asked to describe the effect of his disabilities, he said: "It makes me want to serve God and Not McDonalds[.]" *Id.* He said that he would like to be a pastor and needed money for seminary. *Id.*

United States District Court
Northern District of California

- When a treatment provider called Plaintiff to follow up on Plaintiff's concerning results on the suicidal and homicidal ideation screen, the provider noted "paranoid ideation focused on economy.  Perseveration about spiritual belie[f]s."  (AR at 719).  Plaintiff also reported more frequent passive suicidal ideation.  *Id.* at 720.  The provider referred Plaintiff to intensive outpatient therapy.  *Id.* at 721.

- At a November 2021 appointment, a mental health provider noted the following:

  > In our meeting today patient presented as hyperverbal, circumstantial and delusional.  He began by telling me that he is hoping to become a sovereign citizen and has filed paperwork with the courts to make this happen.  He stated that the banks have cancelled his credit cards due to his spending habits.  He also spoke about being in conflict with the banks because he does not feel that he should have to pay his mortgage.  He states that he is hoping to make his house a church so that he does not have to pay taxes.  He stated that he is a lover of Christ and wants to get some chickens and a cow and live off of the land and worship Christ and not the dollar.  He states that he is "itching" for a fight and that he has a history of being in prison and assaulting officers he does not have any plans to fight anyone currently.  He said the last incident he was holding a sign on the corner and they called the S.W.A.T. team to come and get him.  He states that he is not sleeping much currently and he is staying in the garage to stay separate from his wife due to their conflicts.

(AR at 712).

- Later that month, Plaintiff arrived for a Department of Rehabilitation appointment three hours early, then got in a physical fight with another client waiting in the lobby.  (AR at 1190, 3282).  Plaintiff left when informed that he was early.  *Id.* at 1190.  During the appointment itself, Plaintiff "cried openly several times during the interview because he finds his current situation so dire.  He talked of getting angry easily and 'beating the crap out of' those who have the misfortune of making him angry.  He also demonstrated signs of extreme religiosity, and spoke quite a bit about wanting to dedicate his life to the service of God."  *Id.*  Asked about future careers, Plaintiff "expressed an interest in becoming a Christian pastor or the mayor of Santa Rosa.  He also spoke seriously about running for president against Donald Trump in 2024."  *Id.* at 1191.

- Plaintiff was contacted by the local Social Security field office as part of his claim.  The person Plaintiff spoke with noted Plaintiff "had extreme difficulty staying on tasks [sic]

1  with answering the specific questions that were being asked." (AR at 484).

2  • At an addiction medicine appointment in mid-November, Plaintiff announced that he felt

3  the best and "most balanced" he had in most of his adult life. (AR at 1132).

4  Accordingly, Plaintiff declined the intensive outpatient referral and was unsure whether

5  he should stop using marijuana, which he believed was helping him. *Id.* The provider

6  noted that Plaintiff "engaged in perseveration on the topics of economic concerns,

7  religious ideas including the Pt's concern an impending rapture per his Christian beliefs,

8  and about various political concerns combining all 3 areas of the aforementioned

9  concerns at times." *Id.*

10  • Roughly a week later, Plaintiff arrived late for an appointment and announced that he was

11  "close to going postal." (AR at 1130). He denied suicidal or homicidal ideation, but

12  commented that "you could say Jeff Bezos might be at risk." *Id.* He further reported that

13  he had been easily agitated recently. *Id.*

14  • In a Social Security function report Plaintiff completed around this time, he described the

15  effect of his conditions as "anger, frustration, can't remember passwords I feel so bound

16  that I could Blow!" (AR at 494). He said that before he became disabled, he could

17  "'Steal' get as much as I can from you" as a car salesman. *Id.* at 495. He listed his

18  hobbies and interests as "mastebation [sic], pornography, prostitutes and trying to say

19  hello to females[,]" noting that he did these daily. *Id.* at 498. He also noted being

20  "[p]issed of[f] that I can get a hand job easier than a hello if the $ is rig [sic] [.]" *Id.*

21  When asked about problems getting along with others, he mentioned that he had

22  propositioned his neighbor, after which the neighbor's brothers "wanted to beat me up[.]"

23  *Id.* He described himself as a "ticking time bomb" where social activities were

24  concerned. *Id.*

25  • On November 22, 2021, Plaintiff's addiction medicine counselor noted that Plaintiff's

26  "thoughts and topics of conversation over [sic] veer toward religous [sic] and political

27  concerns as well as a tendency focus on the Pt's frustration about losing money . . . . The

28  Pt often discusses his concerns about an impending rapture realted [sic] to his Christian

United States District Court
Northern District of California

1    beliefs. The Pt also noted today that he is considered running for President of the United

2    States." (AR at 1128).  One of Plaintiff's political concerns was the imposition of "one

3    world currency[.]"  *Id.*

4    On December 1, 2021, Plaintiff was taken to the hospital in the midst of a mental health

5    crisis.  (AR at 1104).  In triage, Plaintiff did not deny suicidal or homicidal ideation, saying that

6    such things "could happen."  *Id.*  Hospital staff noted that Plaintiff alternated between "loud and

7    pressured" yelling and crying in the fetal position on the floor.  *Id.* at 1112–13.  His face would

8    turn red, with bulging veins, as he made vague threats like "I would like to [w]ring someone's

9    neck if they tell me to get a job."  *Id.* at 1112.  Plaintiff reported "getting messages from God" and

10   asserted, claiming "that he is the right choice for the country, he wants to run for president and he

11   will run from the side of the weakness, not the strengths, and he was getting close with God, so he

12   [told his] wife that he has been getting happy ending massages throughout the relationship and

13   masturbating watching a lot of porn."  Plaintiff was deemed a danger to himself and placed on a §

14   5150 psychiatric hold.  *Id.* at 1116.  He was discharged from the hospital on December 9 with a

15   diagnosis of bipolar disorder.  *Id.* at 1011.  His prognosis was given as fair.  *Id.*  He was then

16   transferred to an inpatient mental health facility.  *Id.* at 1099.

17   At the inpatient facility, Plaintiff was prescribed lithium.  (AR at 1350).  A week later,

18   Plaintiff reported feeling more stable and organized, but staff continued to note pressured speech

19   and circumstantial thoughts.  *Id.* at 1352.  Plaintiff's disability benefits continued to be a source of

20   anxiety for him.  *Id.*  After roughly two weeks at the inpatient facility, Plaintiff transferred to a

21   residential rehab facility.  *Id.* at 4076.  Progress reports from that facility stated that Plaintiff had

22   an "open awareness" of his condition but "struggle[d] to manage daily living both inside and

23   outside of a treatment facility."  *Id.* at 4037, 4047.  Plaintiff was discharged from this facility in

24   mid-January 2022.  *Id.* at 4031.

25   Upon his release, Plaintiff engaged in vocational rehabilitation and began attending

26   addiction medicine workshops regularly.  *See, e.g.*, AR at 1053, 1055–56, 1061–62; 1200.

27   Plaintiff complained of being isolated and depressed.  *See, e.g.*, *id.* at 1279, 1283–84, 3688.

28   Plaintiff's psychologist suggested that he begin to attend in-person support meetings, but Plaintiff

stated that he was "intimidated" by the idea of sharing at such a meeting. *Id.* at 1270. He reported low energy and difficulty concentrating throughout this time. *Id.* at 152, 3697, 3701, 3718, 3721.

In July of 2022, Plaintiff was medically approved to become a truck driver. (AR at 593). Plaintiff also began to report passive suicidal ideation once again. *See, e.g.*, *id.* at 3740, 3760, 3775, 3812. By late September of 2022, Plaintiff still had not spoken up at an in-person AA meeting, and he continued to isolate himself. *Id.* at 3811–12. By late October, the passive suicidal ideation continued and Plaintiff was no longer complying with his therapy treatment program. *Id.* at 3853. By early November, Plaintiff had discontinued therapy, saying that he would "maybe" restart when he was less overwhelmed with life events such as his ongoing divorce. *Id.* at 3874.

On February 10, 2023, Plaintiff completed a truck-driver training course. (AR at 585). The program involved 160 hours of instruction. *Id.* Instruction took place on weekdays between 1 and 4 P.M., and students were trained in pairs, with each student driving for 1 hour and inspecting for ½ hour during the school day. *Id.* at 99. On his final report card, Plaintiff was assessed as "Outstanding" or "Very Good" in all areas of evaluation, including criteria that reflected technical competence and professionalism. *Id.* at 585. The course instructor described Plaintiff as "a very punctual student and fast learner." *Id.* at 589.

After graduating from trucking school, Plaintiff worked at the Yellow Trucking Company for one month. (AR at 4465). That company ultimately filed for bankruptcy, leading to Plaintiff losing his job. *Id.* Plaintiff later stated that he was terminated "a couple weeks" before his other coworkers because the others were "quicker and better" at their jobs than Plaintiff. *Id.* at 73. Plaintiff's supervisor at Yellow told him he "was going slow." *Id.* at 72. Plaintiff would have to ask his coworkers which hazardous materials were safe to load together because he could not remember which combinations were dangerous. *Id.* Plaintiff was also unable to consistently remember how to operate the forklift, so he "kind of had to play around with it" on occasion. *Id.*

By the summer of 2023, Plaintiff's depression symptoms were "slightly improved" and he was looking for new work. (AR at 4465). Plaintiff resumed therapy in September. *Id.* at 4481. The first service provider Plaintiff was referred to felt that it was unable to treat his "severe

10

1    depression, bipolar disorder, and passive suicidality[,]" especially as medication had not stabilized

2    his symptoms.  *Id.* at 4184, 6443.  Plaintiff was later referred to another service provider, Dr.

3    McLeod, whom he was still seeing at the end of the record period.  *Id.* at 4531, 6470.

4    **II.        Procedural Background**

5        Plaintiff's first hearing before the ALJ was on February 28, 2023.  (AR at 92).  In

6    preparation for this hearing, Plaintiff requested a medical opinion from Dr. Shin.  *Id.* at 3920.  Dr.

7    Shin opined that Plaintiff's response to treatment was "limited at best" and his prognosis was

8    "guarded to poor."  *Id.* at 1359.  Dr. Shin further opined that Plaintiff would be seriously limited in

9    his ability to perform many core work functions and unable to perform others.  *Id.* at 1361–62.

10   Dr. Shin said that alcohol and substance abuse did not contribute to Plaintiff's limitations.  *Id.* at

11   1363.

12       At the hearing, Plaintiff testified that his Amazon account had been suspended for a

13   trademark violation—he listed his goods under the brand name of another company that used the

14   same wholesaler.  (AR at 102).  Instead of reassessing his business at that point, Plaintiff said he

15   "was reckless and just kept throwing money at it."  *Id.* at 111.  The failure of his business

16   increased his mania, and he reported that he "just felt like I wanted to kill myself or I wanted to

17   hunt down Jeff Bezos and kill him."  *Id.* at 117.  As of the date of the hearing, having recently

18   finished trucking school, Plaintiff felt that he was "just about like ready to go to work[.]"  *Id.* at

19   103.

20       The ALJ issued her first decision on July 10, 2023.  As relevant here, the ALJ concluded

21   that Plaintiff's psychological conditions were nonsevere.  (AR at 177).  The ALJ explained that,

22   under Social Security regulations, the severity of mental illnesses is evaluated based on the

23   conditions' effect on four broad areas of functioning, also called the Paragraph B criteria.  *Id.*  In

24   the first Paragraph B criterion, understanding, remembering, and applying information, the ALJ

25   found that Plaintiff's alleged difficulties with memory were not supported by the record and there

26   was no evidence of an intellectual deficit, meaning Plaintiff was only mildly impaired.  *Id.*  In the

27   second criterion, interacting with others, the ALJ found only a mild limitation because Plaintiff

28   was "cooperative and appropriate" when examined and had been able to attend trucking school.

11

United States District Court
Northern District of California

1  *Id.* at 178.  In the third criterion, concentrating, persisting, and maintaining pace, the ALJ found

2  only a mild impairment because Plaintiff's concentration and attention were within normal limits

3  and most of his scores on a vocational aptitude exam were average.  *Id.*  And in the fourth

4  criterion, adapting and managing oneself, the ALJ found only a mild impairment because Plaintiff

5  was well-groomed when examined and "able to engage with medical providers to discuss

6  symptoms and develop adaptive behaviors."  *Id.*  In reaching these conclusions, the ALJ

7  discounted Dr. Shin's opinion, noting that it cited no specific evidence or testing and was

8  inconsistent with the "limited nature of the treatment," the opinions of non-examining agency

9  doctors who had reviewed the record, and Plaintiff's success in trucking school.  *Id.* at 182.

10  Because the limitations were no more than "mild" for any one Paragraph B criterion, the

11  ALJ concluded pursuant to the relevant regulation that Plaintiff's mental impairments were

12  nonsevere.  (AR at 178).  The ALJ proceeded to analyze Plaintiff's alleged physical impairments

13  and concluded that Plaintiff could return to his previous job as a car salesman.  *Id.* at 183.

14  Accordingly, the ALJ found that Plaintiff was not disabled.  *Id.* at 185.

15  Plaintiff appealed this ruling to the SSA's Appeals Council, which reversed the ALJ and

16  remanded the matter for further proceedings.  (AR at 194).  In particular, the Appeals Council

17  found the ALJ's evaluation of Plaintiff's mental impairments insufficient.  *Id.*  The Council

18  faulted the ALJ for relying on opinions issued by agency consultant doctors before Plaintiff was

19  hospitalized.  *Id.*  The Council was also concerned that the ALJ had not sufficiently addressed

20  Plaintiff's treatment records, except to note where Dr. Shin's exams gave normal results, and had

21  not addressed the fact of the hospitalization itself.  *Id* at 194–95.  Finally, the Council said that the

22  ALJ should have considered Plaintiff's therapy records, since these came from the same facility

23  that Dr. Shin practiced at.  *Id.* at 195.  The Council remanded with instructions for the ALJ to

24  obtain additional evidence on Plaintiff's mental impairments, including (if warranted) consultative

25  or medical source opinions about Plaintiff's work capacity.  *Id.*  The ALJ was also instructed to

26  provide "specific findings and appropriate rationale" for her conclusions on the Paragraph B

27  criteria.  *Id.* at 196.

28  A second ALJ hearing was held on December 19, 2023.  At this hearing, Plaintiff reported

1    that his symptoms were improving.  (AR at 58).  However, Plaintiff noted that he had been deeply

2    depressed for nine months after losing his job at Yellow.  *Id.* at 64.  He reported that he was now

3    seeing Dr. McLeod, but that he hadn't been doing certain things (such as exercising and speaking

4    up in AA meetings) despite Dr. McLeod's attempts to motivate him.  *Id.* at 76.  He reported not

5    speaking up in meetings due to a fear of ridicule.  *Id.*

6         The ALJ issued a second decision on May 1, 2024.  As part of this decision, she found that

7    Plaintiff's job at Yellow had not been "substantial gainful activity" within the meaning of the

8    regulation because it was "discontinued after no more than six months because of the claimant's

9    impairment.  The claimant testified that he was told he worked too slowly, and he had difficulty

10   remembering forklift controls."  (AR at 20).  Despite finding that these cognitive symptoms had

11   cost Plaintiff his job, however, the ALJ proceeded to once again find Plaintiff's mental

12   impairments nonsevere.  *Id.* at 26.

13        The ALJ began by providing an overview of Plaintiff's mental health records.  This

14   overview noted that Dr. Shin's treatment notes often described Plaintiff as having "minimal

15   symptoms" and that Plaintiff had frequently tried to get his temporary disability extended.  (AR at

16   23–25).  The ALJ's overview included summaries of Plaintiff's addiction medicine appointments

17   and his appointments with Dr. McLeod; it did not reference the treatment notes of Plaintiff's

18   previous counselors or the results of mental and behavioral health screenings given to Plaintiff by

19   any of his providers.  *See id.*

20        For the criterion of understanding, remembering, and applying information, the ALJ again

21   found Plaintiff was only mildly impaired.  (AR at 26).  She based this finding on an assessment

22   that showed only mild cognitive impairment, the normal results of a vocational aptitude test,

23   Plaintiff's success in learning to drive a truck, Plaintiff's instructor's comment that he was a fast

24   learner, and the fact that most of Plaintiff's treatment notes did not show memory deficits.  *Id.*

25        For the criterion of interacting with others, the ALJ once more found Plaintiff to be only

26   mildly impaired.  (AR at 26).  The ALJ acknowledged that Plaintiff was prescribed medication for

27   his mental impairments and had "mood abnormalities on examination at times."  *Id.*  However, the

28   ALJ found that this was outweighed by Plaintiff's "improvement with mental health and substance

United States District Court
Northern District of California

13

disorder treatment[,]" the fact that Dr. Shin's notes did not show "behavior, speech or affect abnormalities[,]" Plaintiff's attendance at AA meetings and truck driving school, and Plaintiff's high truck-school grades in respectfulness, teamwork, and completing assignments on time with minimal supervision. *Id.*

The ALJ also affirmed her initial assessment of Plaintiff's "mild" impairment in concentrating, persisting, or maintaining pace. (AR at 26). While she noted that Plaintiff was prescribed medication for his "predominately inattentive" ADHD, she emphasized that most of Plaintiff's treatment notes did not show abnormal attention or concentration. *Id.* She further noted that in trucking school, Plaintiff completed his work on time and with few or no errors, was alert and energetic, and maintained acceptable performance without interference from outside problems. *Id.*

Finally, the ALJ found only mild impairment in Plaintiff's ability to adapt and manage himself. (AR at 26). The ALJ acknowledged that Plaintiff had been psychiatrically hospitalized, received therapy, and took psychiatric medication. *Id.* However, she emphasized that Plaintiff's condition had improved with treatment and abstinence, that Plaintiff attended AA meetings, that Dr. Shin's notes indicated "mild or minimal symptoms and mostly unremarkable mental status examination findings[,]" and that Plaintiff was timely, tidy, well-groomed, and professional according to his truck driving instructor. *Id.*

In reaching these conclusions, the ALJ found Dr. Shin's opinion unpersuasive because it contradicted Dr. Shin's findings of minimal symptoms and generally normal mental status findings. (AR at 33). She also found that Dr. Shin's opinion was too restrictive when compared with other record evidence and inconsistent with the record as a whole, particularly Plaintiff's excellent performance in truck-driving school. *Id.* While Dr. McLeod also provided an opinion, opining that Plaintiff "continued to experience severe symptoms and significant impairment," the ALJ found this one unpersuasive as well. *Id.* at 34. Specifically, the ALJ faulted Dr. McLeod for declining to assess Plaintiff's aptitude for particular jobs, not specifying the number of good and bad days that Plaintiff would have, and opining that substance abuse did not contribute to Plaintiff's limitations. *Id.* The ALJ found Dr. McLeod's opinion inconsistent with the record as a

United States District Court
Northern District of California

1    whole, and more specifically with Dr. Shin's notes and Plaintiff's truck school transcript.  *Id.*

2    Plaintiff appeals.

3    **III.    Standard**

4    The Social Security Act limits judicial review of the Commissioner's decisions to final

5    decisions made after a hearing.  42 U.S.C. § 405(g).  The Commissioner's findings "as to any fact,

6    if supported by substantial evidence, shall be conclusive."  *Id.*  A district court has limited scope

7    of review and can only set aside a denial of benefits if it is not supported by substantial evidence

8    or if it is based on legal error.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th

9    Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and directs

10   courts in their review of factual findings at the agency level.  *See Biestek v. Berryhill*, 139 S. Ct.

11   1148, 1154 (2019).  Substantial evidence is defined as "such relevant evidence as a reasonable

12   mind might accept as adequate to support a conclusion."  *Id.* at 1154 (quoting *Consol. Edison Co.*

13   *v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir.

14   1997).  "In determining whether the Commissioner's findings are supported by substantial

15   evidence," a district court must review the administrative record as a whole, considering "both the

16   evidence that supports and the evidence that detracts from the Commissioner's conclusion."

17   *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's conclusion is upheld

18   where evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart*, 400

19   F.3d 676, 679 (9th Cir. 2005).  However, courts "review only the reasons provided by the ALJ in

20   the disability determination and may not affirm the ALJ on a ground upon which he did not rely."

21   *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

22   **IV.    Analysis**

23   The court cannot conclude that the ALJ's assessment of Plaintiff's mental impairments as

24   "nonsevere" is supported by substantial evidence in light of the record as a whole.

25   An impairment is nonsevere if it "cause[s] no more than 'mild' limitation in any of the

26   functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal

27   limitation in the claimant's ability to do basic work activities[.]"  AR at 27 (citing 20 CFR

28   404.1520a(d)(1)).  Here, the court finds that substantial evidence does not support "mild" findings

United States District Court
Northern District of California

1    in three of the four areas of function.

2           *a. Interacting with Others*

3           The ALJ stated four bases for her "mild" interacting-with-others finding.  The court finds

4    that these do not demonstrate only a "mild" impairment in the context of the record as a whole.

5           First, the ALJ noted that Plaintiff's condition "improve[d] with mental health and

6    substance use disorder treatment."  (AR at 26).  However, "[r]eports of "improvement" in

7    the context of mental health issues must be interpreted with an understanding of the patient's

8    overall well-being and the nature of her symptoms."  *Garrison*, 759 F.3d at 1017.  "They must

9    also be interpreted with an awareness that improved functioning while being treated and while

10   limiting environmental stressors does not always mean that a claimant can function effectively in a

11   workplace."  *Id.*  Here, the fact that Plaintiff's condition has "improved" relative to a time when he

12   required hospitalization for his own safety does not necessarily mean that Plaintiff is now

13   sufficiently "improved" to enter the workforce on a full-time basis.

14          Second, the ALJ stated that "Many of Dr. Shin's treatment notes show mildly depressed

15   mood, but no behavior, speech, or affect abnormalities."  (AR at 26).  However, any number of

16   other providers (and, on occasion, Dr. Shin himself) noted affect abnormalities, generally

17   corresponding to Plaintiff's visible sadness or anxiety.  *Id.* at 882-83, 734-35, 727, 719, 1190,

18   1128, 4038, 4037, 4130, 1076, 4495, 4531.  Further, as described throughout this opinion, records

19   from other providers indicate notable behavioral abnormalities.

20          Third, the ALJ mentioned that Plaintiff attended AA meetings.  However, the record

21   reflects that Plaintiff was consistently unable to speak up in AA meetings despite the urging of

22   multiple therapists over nearly two years.  *See* AR at 1270, 3775, 3811, 3853, 6445, 4531, 6470,

23   76.

24          Finally, the ALJ noted that Plaintiff did well in truck driving school, including being given

25   "outstanding" grades for respectfulness, teamwork, and completing assignments independently.

26   However, Plaintiff only attended truck-driving school for three hours per weekday over a period of

27   less than three months.  Additionally, Plaintiff suffers from bipolar disorder, which is

28   characterized by fluctuations in symptoms: "Episodes of mood swings from depression to mania

United States District Court
Northern District of California

16

may occur rarely or multiple times a year. . . . Between episodes, some people have long periods of emotional stability." *Bipolar Disorder: Symptoms and Causes*, THE MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955 (Aug. 14, 2024). For these reasons, Plaintiff's performance during his brief time in truck-driving school should not be given more weight than a longitudinal record of problems in interacting with others.

For example, Plaintiff has a notable history of verbal and sometimes physical aggression. Besides the incidents recounted above, Plaintiff reported that he lost a previous car-sales job "because my boss didn't like me because I was angry alot [sic.]" (AR at 521). In May of 2022, well after Plaintiff's release from residential mental health treatment, he told Dr. Shin that he was "so angry about all the injustices that the world has put me through I feel like I could snap and explode with rage and who knows what damage I will bring on myself as a result[.]" *Id.* at 3713. In October of 2022, despite Plaintiff's normal inability to speak out in AA meetings, Plaintiff berated his AA sponsor in front of the entire group after the sponsor made a comment Plaintiff perceived as critical. *Id.* at 3828. Plaintiff later "fired" his sponsor as a result of this incident. *Id.*

Also notable is Plaintiff's history of being inappropriate in conversation. In addition to the incidents with healthcare providers noted in the recitation of facts, he told one provider that he "[s]trained [his] relationship with family after confessing he had erection around niece, 'I thought that if I put it out there, everyone else would put their stuff out there too. Like about family members getting molested when we were kids.'" (AR at 4129).

At other times, the record reflects that Plaintiff isolated himself from others. *See* AR at 719 ("The Pt noted that in the past week that he has experienced some instances of intentional social isolation not seeking contact with social supports as a result of feeling overwhelmed with stress impacting his overall level of functioning."), 740 ("Felt MJ use brought him out of being reserved around others and helped him be more sociable."), 498 (Plaintiff says "I am in solitude and have no one" despite regularly attending church and addiction support groups), 1297 ("He is lonely and isolated. He said he needs to get out and go to more meetings."), 1283 ("Doug still complains of being isolated. He is trying to go to meetings and talk to people. . . . He reports

17

confusion and sadness, about being isolated and where he is going in his life."), 3718 ("Patient reports that he feels like he doesn't want to move out of his chair, hard to get out and do things, or go to meetings."), 3788 ("He reports he has been avoiding talking to others, feeling isolated.").

Finally, and notably, the record reflects that Plaintiff suffered from perseveration which impacted his interactions with others. Even when Plaintiff was not fixated on religion and conspiracies, his communications with his doctors indicate that he aggressively sought out his desired outcomes despite repeated denials (or, in one instance, an actual inability to provide the requested backdated form). Nor was this merely a function of Plaintiff seeking disability leave: he was equally intractable with his eye doctor in seeking to get his eyes "fixed" despite the optometrist telling him that surgery was unlikely to help and he could only offer glasses or contacts. *See* AR at 2294 ("Ugh! Can I get a prescription for glasses please? I'm just frustrated is there anyway [sic] to get these eyes done? I can't deal with this", later: "Hey Doc would you please see what you can do I know that I'm being impatient but I can't see man it's driving me crazy I mean I have the strongest reading glasses available I need some help brother please see what you can do please"), 785 (complaining about a headache from the glasses and again requesting to get his eyes "fixed"), 2316 (refusing to go to ophthalmology without a surgery referral because that department believed his sight could be corrected with glasses), 2321 (asking his pulmonologist for a referral to ophthalmology for eye surgery because "I got two different visions and it makes me sick to have glasses on or off Mix that with my ADHD and not being able to find my glasses or getting food smeared all over him I don't know I feel like I'm handicapped and I really need some help getting the stuff done could you please put in a referral for me to get my eyes taken care of please"), 2356 (again complaining to optometrist about glasses and requesting to have his eyes "fixed").

Taken as a whole, the record reflects more than a "mild" impairment in interacting with others. Accordingly, the ALJ's determination of nonseverity must be reversed.

### b. Concentrating, Persisting, and Maintaining Pace

The court also finds that substantial evidence does not support a "mild" limitation in concentrating, persisting, or maintaining pace.

United States District Court
Northern District of California

1    In support of this finding, the ALJ asserted that most of Plaintiff's treatment notes did not

2    show abnormal attention or concentration.  However, Plaintiff's treatment contain many

3    observations by providers of Plaintiff's difficulty concentrating, as well as Plaintiff's complaints

4    about the same.  *See* AR at 3416 (Plaintiff requests higher dose of Adderall in spring 2019 because

5    "I don't think I'm as focused on tasks like I was in the beginning"), 905 (November 2019

6    treatment notes say "Patient is now feeling a lack of focus at work mostly. He states that if he has

7    bunch of things thrown at him, or given 3-4 things to do he panics because he isn't able to focus

8    enough on them. He spaces more then he use[d] to."), 779 (Plaintiff reports trouble following

9    conversations), 2348 (cognitive assessment reflects that Plaintiff is unable to pay attention to or

10   understand books, shows, or magazines), 725 (Dr. Shin notes "poor concentration" as a symptom

11   of Plaintiff's depression), 719–20 (addiction medicine provider notes Plaintiff as distractible, with

12   impaired concentration), 722 (Plaintiff complains to Shin that "I get lost on the computer and I

13   forget what I'm doing whenever I get halfway done with something because I always get

14   sidetracked with all these things And forget what I'm doing I have so many loose ends and I'm so

15   scattered"), 714–15 (addiction medicine provider notes Plaintiff as distractible, with impaired

16   concentration), 734 (provider describes Plaintiff as distractible, with attention "somewhat impaired

17   at times"), 1133 (addiction medicine provider notes Plaintiff with poor attention and impaired

18   concentration), 1130 (nurse notes "Patient did require some redirection and focusing from group

19   facilitators"), 1128 ("The Pt noted that he frequently forgets what he is doing and has frequent

20   notable difficulty at times finding his keys or resetting passwords for example because of his

21   difficulties staying focused. . . . The Pt noted that he does still feel he has seen degrading ability

22   notable in the past few years in his ability to concentrate adequately."), 1128–29 (mental status

23   exam notes poor attention and impaired concentration), 4059 ("Client becomes easily distracted by

24   external distractions unrelated to client's recovery"), 4053 (noting problems of "[d]istraction from

25   recovery, boredom, complacency."), 4136 ("Reports he is having severe difficulty concentrating,

26   comprehending and retaining info taught in program.  Frequently feels 'bored' with the material

27   and often daydreams.  Easily distracted and has difficulty completing tasks without distraction."),

28   3270 ("He reports that his concern about his memory is more that when he starting to do a task,

then he will get distracted on the task and then forget what he was working on. . . . Finding 'more issues with organization and being able to present something'. If has 4 to 5 steps to it, will have issues."), 3939 (Dr. Shin notes Plaintiff "has hard time doing multi-step or multi-tasking. (more than 3-4 steps)"), 6450–51 (new provider notes "issues with concentration" and "tangential" speech). Indeed, as noted above, even the Social Security Administration's field representative once observed that Plaintiff had difficulty concentrating.

The ALJ also noted that Plaintiff completed his trucking-school work on time, was able to carry out his job duties on a daily basis, completed his tasks accurately, and maintained acceptable performance. Again, while this may be true, it represents relatively short intervals over a relatively short period of time in the context of a condition whose symptoms can fluctuate over long periods of time. It also bears noting, as the ALJ found, that Plaintiff lost his subsequent employment in part because he could not remember certain procedures. Ultimately, the record as a whole compels the conclusion that Plaintiff was more than mildly impaired in his ability to concentrate, persist, and maintain pace.

### c. Adapting and Managing Oneself

Finally, the record as a whole demonstrates that Plaintiff was more than mildly impaired in his ability to adapt and manage himself.

The ALJ noted Plaintiff's history of psychiatric medication, therapy, and hospitalization, but also noted that Plaintiff's symptoms improved with outpatient treatment, medication, and abstinence. As the court noted above, and as the Ninth Circuit held in *Garrison*, the mere fact of some "improvement" in the mental health context does not necessarily mean that a patient is ready to work, or even that the improvement is permanent.

The ALJ also noted that Plaintiff was able to attend AA groups. However, as described above, the record indicates that Plaintiff was unable to speak according to the conventional practice of such groups. Instead, the only record of his speaking up at an AA meeting was to berate his sponsor for a perceived criticism.

The ALJ stated that Dr. Shin's notes indicated "mild or minimal symptoms[.]" (AR at 26). This appears to be a reference to the Global Assessment of Function (GAF) scores appended to

*United States District Court*
*Northern District of California*

1    Dr. Shin's notes, which were uniformly given as "GAF 81-90 minimal symptoms." *See, e.g.*, 137,

2    155–56, 1260.  However, the record as a whole reveals that providers, including Dr. Shin,

3    frequently assessed Plaintiff's mental health conditions and symptoms as either moderate or

4    severe.  *Id.* at 3390 (screen indicates "moderate" depression in March 2017), 3398 (Dr. Shin

5    originally diagnosed Plaintiff with "moderate" depressive disorder), 3525 (on a screening before

6    anxiety class, Plaintiff was assessed as a moderate suicide risk with moderate behavioral health

7    impairment severity and moderate depression), 3546 (Plaintiff's anxiety was assessed as moderate

8    on screening), 821 (a neurologist described Plaintiff's COVID-related anxiety as "extreme"), 744

9    (a treatment provider noted passive suicidal ideation), 2589 (Plaintiff endorsed sufficient suicide

10   symptoms that a suicide prevention plan was required, and mental health screening tests indicated

11   "[s]evere" depression and anxiety), 720 (Plaintiff reported increasing passive wishes to be dead),

12   1011 (Plaintiff's depression was described as "severe" on arrival at the hospital), 4173 (Plaintiff

13   was found "moderately anxious" on arrival at residential treatment), 4145 (Plaintiff's depression

14   evaluated as "severe" on screening), 6514 (Plaintiff receives "severe" BHI score of 91), 3740–41

15   (Plaintiff endorses passive suicidal ideation and is assessed with moderately severe depression),

16   3772–73 (BHI of 97, depression moderately severe, anxiety mild to moderate), 3808–09 (BHI of

17   90, severe depression), 3812 (passive suicidal ideation), 3831 (BHI 90, depression severe, anxiety

18   moderate), 3871–72 (BHI 90, depression severe), 4462–63 (BHI 85 (severe) and depression

19   moderate), 6443 (turned down by mental health provider due to severity of symptoms), 4499 (Dr.

20   Shin notes a screening score corresponding to moderate depression), 4534–35 (BHI 81, depression

21   severe, anxiety moderate), 4546 (moderate depression), 4560 (same).  These results and

22   observations span from before Plaintiff's alleged disability onset until the fall of 2023.  The last

23   set of screening scores in the record, from mid-November 2023, reflect a severe BHI of 91 and

24   severe depression.  *Id.* at 6492, 6647.  Accordingly, Dr. Shin's identical passing comments of

25   "minimal" symptom severity on one assessment are not substantial evidence of the severity of

26   Plaintiff's condition in light of the record as a whole.

27        The ALJ also stated that Dr. Shin's notes reflected "mostly unremarkable mental status

28   examination findings[.]"  (AR at 26).  However, the record is replete with abnormal mental status

21

examination findings from Dr. Shin and others. *Id.* at 854 (Plaintiff's insight and judgment noted as "fair"), 847 (same), 3508 (insight fair and judgment marginal), 743 (fidgety, rambling, anxious, tangential or loose thought process, paranoid ideation, distractable, concentration somewhat impaired, impulse control and insight marginal to fair, judgment fair), 719-20 (speech rambling, mood depressed/anxious, affect congruent, thought processes tangential/loose, abnormal thought, distractible, impaired concentration, marginal impulse control and insight, fair judgment), 714-15 (fidgety, rambling/hyperverbal, elevated mood, circumstantial thought process, distractible, impaired concentration, intact memory, poor impulse control, poor insight and judgment), 1133 ("rambling and hyperverbal" speech, "mildly anxious" mood and congruent affect, "tangential" thought processes and associations, poor attention, impaired concentration, some impairment with recent recall, impulse control marginal, insight and judgment marginal), 1128-29 (fidgety behavior, rambling/hyperverbal speech, anxious mood, congruent affect, disorganized/tangential though process, poor attention, impaired concentration, short- and long-term memory impairment, "struggles with recall at times", impulse control poor to marginal, insight and judgment marginal), 1114 (demeanor "hostile, guarded and at times can be pleasant", speech "loud, pressured and rapid", mood "depressed, anxious, irritable, angry and elevated", affect "labile", thought content "paranoid ideation", attention "distractible", impulse control "poor", insight and judgment "poor"), 1027 (psychomotor agitation (but no abnormal movements), uncooperative despite good eye contact, speech spontaneous/rapid/pressured, thought process tangential, thought content "A[uditory ]H[allucinations], Grandiose and Paranoid Delusions", mood anxious/elevated, affect labile, I/J "Poor and Impaired"), 1025 ("Affect: Anxious, Psychomotor: Hyperactive, Thought Associations: Tangential . . . Insight/Judgment poor, Impulse control poor, Thought Process: Abstraction concrete, computation poor, Thought Content: Progress no change, Mood: Progress no change"), 1023 ("Speech: Pressured, Psychomotor: Hyperactive, Thought Associations: Tangential . . . Insight/Judgment fair, Impulse control fair"), 4073-74 (slumped posture, bland affect, emotional numbness, feeling weak), 4055 (accelerated thought flow), 3739 (insight and judgment fair).

    It should also be noted that even when Plaintiff was suffering from severe symptoms, these

United States District Court
Northern District of California

were not necessarily reflected in mental status examinations.  At a therapy appointment in August of 2022, for example, Plaintiff expressed suicidal ideation and was assessed with a Behavioral Health Index of 97 out of a possible 100, an extremely severe score.  (AR at 3775).  Despite the fact that Plaintiff's symptoms were considered severe enough that a follow-up appointment was booked for him on an expedited basis, Plaintiff's mental status examination results were noted as normal at this appointment.  *Id.* at 3775–76.

Finally, the ALJ points to Plaintiff's trucking school report card, which noted his timeliness, tidiness, regular attendance, competence, and acceptable performance without interference from outside pressures.  Again, it must be remembered that these results represent a snapshot in time on an undemanding schedule in the context of a disease whose symptoms characteristically fluctuate over long periods of time.  Accordingly, this does not represent substantial evidence in light of the record as a whole.

The court notes that the ALJ did not address Plaintiff's extended leave for COVID-related anxiety in her analysis of Plaintiff's ability to adapt or manage himself.  The record indicates that Plaintiff suffered from severe anxiety regarding the COVID-19 pandemic, that Plaintiff reported physical symptoms such as panic attacks and nausea when leaving his home, that Plaintiff was assessed and found to be short of breath while wearing a mask despite no physical explanation for this, and that multiple care providers (including the doctor who ultimately directed that he stop receiving disability extensions) believed that Plaintiff's fear of COVID was genuine and severe. The ALJ acknowledged that Plaintiff stopped working "due to fears of COVID-19[.]"  (AR at 29). However, the ALJ does not appear to have evaluated any of this evidence in the context of Plaintiff's anxiety and its effect on his ability to adapt and manage himself.

For the foregoing reasons, substantial evidence does not support the ALJ's determination that any of the above-listed areas of function were only "mildly" impaired, and accordingly does not support the ALJ's conclusion that Plaintiff's mental illnesses were "nonsevere."

## V.    Instructions for Remand

An erroneous finding that an impairment is not severe is harmless if the limitations caused by that impairment are factored into later steps of the ALJ's analysis.  *Lewis v. Astrue*, 498 F.3d

United States District Court
Northern District of California

909, 911 (9th Cir. 2007).  Here, however, the ALJ did not incorporate Plaintiff's mental impairments into Plaintiff's residual functional capacity, which contains no restrictions indicating any kind of mental limitation.  (AR at 28).  Accordingly, the error was not harmless, and remand is required.

On remand, the ALJ is directed to review the full record, including Plaintiff's therapy notes from other providers and the related mental health screenings, in determining the severity of Plaintiff's impairments.  The ALJ is further directed to reconsider the opinions of Drs. Shin and McLeod, which were rejected as inconsistent with the evidence.[4]

**IT IS SO ORDERED.**

Dated: September 9, 2025

ROBERT M. ILLMAN
United States Magistrate Judge

_____

[4] The court notes that the ALJ also rejected Dr. McLeod's opinion because Dr. McLeod opined that substance abuse did not contribute to Plaintiff's impairments.  However, the record indicates that Plaintiff has been sober for the entire time he has seen Dr. McLeod, so substantial evidence does not support this reason for discounting Dr. McLeod's opinion.